WILMA WOODRUFF et al., Individually and Doing Business as HARR-WOOD NURSING HOME, Respondents-Appellants, v JOSEPH CASTALDO et al., Appellants-Respondents.

Fourth Department, December 20, 1985

### APPEARANCES OF COUNSEL

*Sugarman, Wallace, Manheim & Schoenwald (George De-More* of counsel), for appellants-respondents.

*Melvin & Melvin (Roger Bradley* of counsel), for respondents-appellants.

### OPINION OF THE COURT

SCHNEPP, J.

Plaintiffs, as tenants under a long-term lease which provided for the completion of construction of a nursing home, seek to recover damages arising from an alleged breach of the construction provisions of the lease agreement. All parties appeal from a judgment which awarded plaintiffs damages in the sum of $150,000, restricted the manner of use of the damage award, denied a declaration of plaintiffs' right to assign their lease to a corporation and limited the manner in which the judgment could be enforced. We previously held the case, reserved decision, and remitted the matter because the Referee appointed to hear and determine the issues failed to make appropriate factual findings *(Woodruff v Castaldo,* 110 AD2d 1040). The controlling issue for resolution on this appeal concerns the measure of damages to be applied to a landlord's breach of an agreement in a lease to make improvements. For the reasons which follow, we hold that the Referee erred in measuring plaintiffs' damages by the cost to cure the deviations and omissions of the defendants.

On May 16, 1968 plaintiffs entered into a lease agreement with Grand Central Equities Corp. for the construction and long-term lease of a nursing home. Under that lease Grand Central agreed "to construct and complete a 120-bed nursing home on the premises demised hereunder in accordance with

the plans and specifications prepared * * * by Edward A. Breitenbach, architect, as said plans shall have been modified between the 'LANDLORD' and its designee contractor which plans and specifications shall be approved by the 'TENANT' ''.

On August 18, 1970 Grand Central entered into a general construction agreement with the Joseph Castaldo Construction Co. to perform all the work except for certain mechanical work including plumbing, heating and ventilation which was to be performed by the Medtel Company under a separate contract with Grand Central. Castaldo Construction in turn subcontracted the electrical and roofing work. The record establishes that Grand Central made changes in the original plans and specifications which were incorporated in the various contracts and subcontracts.

Construction of the project was halted in November 1971 and not long afterward Grand Central went bankrupt. Work on the project was then suspended for more than a year while the parties looked for a substitute owner. Early in 1973 the property was transferred to ACSP Realty Corp., a corporation owned by Joseph Castaldo and Alma Castaldo, his wife. On March 7, 1973 plaintiffs and ACSP Realty entered into a long-term lease agreement providing for the completion of the nursing home. This lease had a term of 30 years (with an option to renew) and provided that "the 'LANDLORD' agrees at its own cost and expense to complete a 120-bed nursing home which has been partially constructed * * * in accordance with the plans and specifications which were originally prepared by Edward A. Breitenbach, architect, *as subsequently modified,* and which plans have been approved by the 'TENANT' '' (emphasis added).

On or about November 29, 1973 ACSP Realty Corp. transferred title to the property and assigned the lease to the defendants Joseph D. Castaldo and Alma Castaldo. The substitution of the Castaldos as landlords in place of ACSP Realty was subsequently recognized by the plaintiff tenants in agreements amending the lease dated November 30, 1973 and February 6, 1974.

By December 1973 one third of the building, designated wing A, had been completed and plaintiffs assumed occupancy thereof. The remaining wings C and B were completed and occupied by plaintiffs in February and March 1974. During this post-March 1973 construction phase, Joseph Castaldo made further changes in the plans and specifications.

After plaintiffs occupied the building in 1974 they accumulated a list of grievances arising in part from changes in the plans and specifications and in part from poor workmanship. Plaintiffs and Joseph Castaldo discussed the problems at meetings in September and October 1974. At the October meeting Castaldo refused to make further corrections and this litigation ensued. Plaintiffs' amended complaint states causes of action, *inter alia*, for breach of the lease and negligent construction.

In his original decision the Referee specifically found that Grand Central had approved changes in the roofing, electrical and mechanical specifications which Castaldo pointed out to plaintiffs before he assumed ownership of the project and for that reason Castaldo insisted that the lease contain the "as subsequently modified" language. In addition, the Referee found that plaintiffs' claims that the roof had to be replaced and the electrical system substantially rewired required "economically wasteful" repairs, that problems with the roof were largely attributable to plaintiffs' poor maintenance and, in any event, that it would be unjust to charge defendants with changes authorized by Grand Central, and he absolved them from any liability for those changes in the work.

In regard to changes in the plans made by Castaldo after March 1973, the Referee found that certain changes were approved by plaintiffs but concluded that, although Castaldo had acted in good faith and substantially performed the contract, "there remain[ed] extensive deviations and omissions which can and should be cured". The Referee did not specify which deviations he meant, but he awarded plaintiffs an allowance of $150,000 to cover their attorneys' fees and to repair the building.

Following remittitur, the Referee again relieved "defendant" of any liability for not complying with the original heating, roofing and electrical specifications under the Grand Central lease, specified the deviations and omissions in the electrical system, the mechanical specifications, the site work, and the general construction work which breached the ACSP lease and found that the cost to cure these deviations, which were "substantial and necessary to the efficient operation of the nursing home," was $169,500.

The judgment appealed from awarded damages against the Castaldos, ACSP Realty and Joseph Castaldo Co. in the amount of $150,000 with interest from February 1, 1974,

subject to the restrictions that the damage award be applied only to pay plaintiffs' attorneys and to cure defects in the building. The Referee in his supplemental decision found that the amount of damages to which plaintiffs are entitled increased from $150,000 to $169,500.

The order and judgment appealed from also properly directed that enforcement of the judgment was subject to the limitation in the lease that "TENANT expressly agrees to look solely to the estate and property of the LANDLORD in the demised premises for collection of any judgment"; awarded plaintiffs $11,500 on their cause of action for overpayment of rent and directed "that such other relief requested by plaintiffs in their complaint is denied".

Defendants contend that to establish liability plaintiffs must show that the alleged defects and omissions in the building have harmed plaintiffs' business and point to the undisputed evidence that the nursing home has been fully occupied since it opened. Plaintiffs disagree with the Referee's interpretation of their lease with Grand Central and deny that they authorized or approved any change in the original plans and specifications except for minor specified changes. They urge us to review the record and make new findings of fact regarding additional deviations and omissions from the plans which breached the lease and to increase the award of damages by $332,217.28.

The Referee's findings on liability are divided into two parts. Regarding changes in the plans and specifications approved by Grand Central under the original lease he determined that Grand Central reserved to itself the right to modify the plans and that plaintiffs waived in advance any right to notice of such changes. Included in this period were several significant changes in the plans, including modifications in the roofing from a four-ply to a three-ply roof, changes in the telephone system and elimination of the television antenna. We agree that defendants were not liable for changes made by Grand Central, but for a different reason.

The Referee credited the testimony of Joseph Castaldo that before he agreed to take over the project he met with plaintiffs' representative, Leslie Woodruff, at the site on several occasions and discussed with him the modifications made by Grand Central. Woodruff's conversations with Castaldo and the inclusion in the lease with ACSP Realty of the language "as subsequently modified" clearly put plaintiffs on notice that

the original plans and specifications had been altered. Indeed, the Referee found "that was the reason Castaldo insisted that the lease contain the language 'as subsequently modified'." Since plaintiffs had an opportunity to inspect the project and were aware or should have been aware of changes in the plans, it is evident that they relinquished any right to insist on compliance with the original specifications. In our view, defendants were obligated only to complete the project according to the plans as modified, as provided in the March 7, 1973 lease.

Pursuant to our remittitur, the Referee made specific findings of fact concerning the changes in the plans which breached that lease. The Referee's two decisions, considered together, now adequately identify the post-March 7, 1973 changes which were not approved by plaintiffs. The Referee found that specific deviations and omissions in the electrical system, mechanical specifications, site work and general construction work breached the lease. Reviewing the findings and conclusions of the Referee in the light most favorable to his decision (see, McCall v Town of Middlebury, 52 AD2d 736; see also, Atkin v Union Processing Corp., 90 AD2d 332, 334, affd 59 NY2d 919), we find that they are supported by the record.

Defendants contend that plaintiffs failed to establish a prima facie case of breach because the nursing home has been fully occupied since it opened for business. Defendants' concern goes to the issue of damages and not liability. Plaintiffs bargained for a completed nursing home built according to plans and specifications which they had approved. They established at trial that the defendants breached the lease in a number of respects by modifying and omitting certain of the specifications which the Referee determined were substantial and necessary to the efficient operation of the nursing home. Having established that defendants breached the lease, plaintiffs are entitled at least to nominal damages regardless of the undisputed fact that the nursing home has been operating at full capacity since it opened.

The Referee apparently concluded that plaintiffs' damages should be measured by the usual measure of damages available to owners against contractors, i.e., the cost to cure. However, mindful that defendants are the title owners and that plaintiffs are merely tenants, the Referee fashioned a hybrid remedy which amounts, in essence, to judgment for specific performance and an award of attorneys' fees. The judgment requires plaintiffs first to pay their attorneys and

witnesses the sum of $55,943 plus the legal fees incurred on appeal, and restricts their use of the balance of the judgment to repairing the defects identified as breaches of the lease. In short, defendants are required to pay other contractors to repair the building and to pay plaintiffs' attorneys' fees and the costs of litigation.

Cost to complete is the appropriate and usual measure of damages for breach of a construction contract where the injured party is the owner of the premises *(American Std. v Schectman,* 80 AD2d 318, 321). It is not, however, the proper measure of damages for a landlord's breach of a covenant in the lease to make improvements. Upon breach of a landlord's duty to make improvements, the tenant may do the work and recover the cost thereof, or he may sue for damages measured by the reduced value of the leasehold. "The tenant may not recover both damages and reimbursement for the repairs he has made; he can recover only one of the two items." (34 NY Jur, Landlord and Tenant, § 441, at 309.)

Ordinarily, the general damages recoverable are measured by the diminution in rental value of the demised premises, i.e., "the difference in the rental value of the premises as they are and as they were to be, regarding the premises as a whole" *(Thomson-Houston Elec. Co. v Durant Land Improvement Co.,* 144 NY 34, 47; *see generally,* 34 NY Jur, Landlord and Tenant, § 440; Ann., 28 ALR2d 446, § 26, at 481). In the alternative, the tenant may do the work himself and then sue to recover the cost incurred, either in an independent action on the contract or by way of counterclaim in an action brought for the rent *(Thomson-Houston Elec. Co. v Durant Land Improvement Co., supra,* p 48; *Susskind v 1136 Tenants Corp.,* 43 Misc 2d 588, 595; 34 NY Jur, Landlord and Tenant, § 440; Ann., 28 ALR2d 446, § 27, at 484-485). "However, as a general rule, equity will not specifically enforce agreements to make repairs, since the enforcement of a decree therefor would be difficult and the remedy at law in most if not all cases affords full redress for the injury." (34 NY Jur, Landlord and Tenant, § 440, at 304; *see, Beck v Allison,* 56 NY 366.)

Plaintiffs made only minor repairs on their own and sued for general compensatory damages. They adduced the testimony of several engineers and architects as to the nature and extent of the deviations and omissions from the specifications and the cost to complete construction, as of 1981, according to the original plans. Plaintiffs also presented a real estate appraiser who testified that as of April 1982, the date of his

inspection, plaintiffs had sustained present value damages of $136,085 for diminution in rental value for the remaining term, including the option period, and $61,881 for the eight years from December 1973 through April 1982 for a total of $197,966. This expert stated that the rent reserved in the lease was equal to market value if the project had been properly completed but that the deviations and omissions from the plans reduced the market value of the property approximately 7½%. On cross-examination he testified that the nursing home had been operating at full capacity; however, his direct testimony as to damages was based on plaintiffs' overall financial statements which indicated to the witness that deviations from the specifications had resulted in excessive operating expenses.

The Referee ignored the appraiser's testimony on the ground that "considering that the plaintiffs have been operating the nursing home at full capacity and profitably for over ten years, if they are entitled to receive any damages at all they are to be measured by the cost to cure * * * therefore I find it unnecessary to evaluate or analyze the appraiser's estimate of damages based upon any loss to the plaintiffs' leasehold." This was error.

The Referee treated plaintiffs' claim for damages as if it were one for reimbursement for the cost of actual repairs, although he directed that attorneys' and witness' fees be paid from the award of damages. The Referee's instincts were basically correct; however, the fixing and award of attorneys' fees was improper and, given that plaintiffs had not actually made the repairs, his decision did not reimburse them for costs incurred, but rather enjoined defendants to create a fund to pay for future repairs.

Plaintiffs sought both diminution in value of the leasehold and cost to cure, thus demonstrating their confusion as to the proper measure of damages. We cannot make findings from the record and award damages based on the appraiser's testimony of diminution in value of the leasehold, since his testimony was not evaluated by the Referee and it included items which do not constitute breaches of the lease, e.g., modifications made by Grand Central. As a matter of fairness they should have the opportunity on a retrial to elect a proper measure of damage and to offer appropriate proof (see, 487 Elmwood v Hassett, 107 AD2d 285).

In his original decision the Referee found that "the plain-

tiffs have sustained their burden of proving that the defendant contractor and the defendant owners and landlords have in some respect failed to construct the facility in accordance with the plans and specifications". He did not find that the contractor negligently performed the work and indeed plaintiffs submitted no proof of negligence. Any claim for damages by plaintiffs for breach of the ACSP lease must be asserted against the "Landlord" who under the assignment is Joseph Castaldo and Alma Castaldo. The defendant Joseph Castaldo Co., Inc., made no contract with plaintiffs. Thus, it could not be found responsible for omissions or deviations, and the complaint against it should have been dismissed.

Finally, plaintiffs' argument that they should be allowed to assign the lease to a corporation is without merit since the lease unambiguously prohibits plaintiffs from assigning their interests to a corporation.

Accordingly, the judgment should be modified by vacating it as against the defendant Joseph Castaldo Co., Inc., and as to the award of money damages against the remaining defendants, and the matter should be remitted to Trial Term for a new trial on damages and, as modified, affirmed.

DILLON, P. J., CALLAHAN, DENMAN and PINE, JJ., concur.

Judgment unanimously modified, on the law and facts, and, as modified, affirmed, without costs, and matter remitted to Supreme Court, Oswego County, for a new trial, in accordance with opinion by Schnepp, J.